J-S27035-16

2016 PA Super 97

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| BRADLEY JASON HASLAM, JR., | |
| Appellant | No. 1694 MDA 2015 |

Appeal from the Judgment of Sentence September 18, 2015
In the Court of Common Pleas of Schuylkill County
Criminal Division at No(s): CP-54-CR-0001805-2014

BEFORE:  SHOGAN, J., DUBOW, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:                    **FILED MAY 09, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Schuylkill County following Appellant's conviction on the charges of possession with the intent to deliver a controlled substance (methamphetamine) ("PWID"), possession of a controlled substance (methamphetamine), possession of a small amount of marijuana, and possession of drug paraphernalia.[1]  Appellant contends the Honorable Judge John E. Domalakes erred in denying his pre-trial motion to suppress the physical evidence seized by parole agents and state police officers.  We affirm.

_____

[1] 35 P.S. §§ 780-113(a)(30), (16), (31), and (32), respectively.

*Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: Following his arrest, on January 19, 2015, Appellant filed a counseled pre-trial motion seeking to suppress the physical evidence seized by parole agents and police officers. On March 9, 2015, the matter proceeded to a suppression hearing before Judge Domalakes.

At the hearing, Agent Erica Cola testified she supervised Appellant's father, who was on parole and living at a house on Chestnut Street in Pottsville. N.T., 3/9/15, at 8-9. Agent Cola noted that, as a condition of Appellant's father's parole, he was required to "submit to a search of [his] person, property, residence or vehicle for violation of the conditions of [his] probation and parole throughout the period of [his] supervision." *Id.* at 11. Moreover, as a condition of his parole, Appellant's father was notified he would "be subject to periodic visits by [his parole] [o]fficer at [his] residence or place of employment and by law be subject to the search of [his] person, property and residence without [a] warrant." *Id.*

Agent Cola testified that, shortly after Appellant's father commenced his period of parole, she received complaints from his neighbors that there was "a large amount of traffic in and out of the home. Drug activity, possible firearms in the home." *Id.* at 12. As a result of the complaints, on August 5, 2014, Agent Cola went to the subject house in an effort to make contact with Appellant's father, however, he was not at home. *Id.* at 13.

After receiving additional complaints from neighbors, on August 12, 2014, at approximately 9:45 a.m., Agent Cola, along with other parole

agents, went to the subject house with the intent of making contact with Appellant's father. *Id.* at 14. Upon arriving at the house, Agent Cola noticed a hypodermic needle lying on the ground near the steps of the house's landing. *Id.* at 19. She also noticed the house had outside video cameras positioned so that the occupants could view who was approaching from the street and the front door. *Id.* at 15. Agent Cola, who could hear noise coming from inside the house, knocked on the door. *Id.* She testified it "took about 20 minutes for someone to even answer the door[,]" and finally Appellant's paramour, Jenna Morrow, opened the door with Appellant standing behind her. *Id.* at 16.

Agent Cola asked Appellant and Ms. Morrow to sit at the kitchen table while other parole agents entered the house. *Id.* at 16-17. She indicated that, while she talked to Appellant and Ms. Morrow, other agents were upstairs clearing the house, "maintaining safety at the scene[,]" and attempting to locate Appellant's father. *Id.* at 17-19. Agent Cola testified she asked Appellant where his father was at that moment, and he replied he did not know. *Id.* She asked Appellant if his father was in the house, and he replied he did not know. *Id.* She then asked the pair if there was anyone else in the house, and they responded negatively. *Id.* at 17. However, shortly thereafter, three people came down the steps and into the living room, where Agent Cola asked them to sit. *Id.* at 18. In identifying the three individuals, Agent Cola discovered that two of the individuals were wanted for probation and parole violations. *Id.*

On cross-examination, Agent Cola indicated Appellant was free to leave the house at any time; however, she admitted that, as long as he remained in the house, Appellant was not free to roam around unaccompanied by an agent as there had been a report of a firearm in the house. *Id.* at 24-26. Accordingly, for the safety of the parole agents, she asked Appellant and Ms. Morrow to sit at the kitchen table while the house was being searched. *Id.* at 24. Agent Cola noted Appellant was not handcuffed during the encounter. *Id.* at 26. She further testified, in relevant part, as follows on cross-examination:

> **Q:** Jenna Morrow answered the door. [Appellant] did not answer the door with Miss Morrow? Can we agree on that?
> **A:** He was behind her.
> **Q:** He was behind her?
> **A:** That's how they ended up staying downstairs with me as I took them into the kitchen.
> **Q:** So it's your statement that my client, [Appellant], never had contact with any probation officer in his room that you know of?
> **A:** No. No, he was downstairs with me at the kitchen table. He was not back upstairs.
> **Q:** Okay. So did he ever, in your presence, tell anyone from Probation, That's my bedroom up there. This side of the house is mine, that side of the house is my father's?
> **A:** No.
> **Q:** Never made that statement?
> **A:** No.
> **Q:** Okay. Did you ask [Appellant] where his room was?
> **A:** No, I did not.
> **Q:** Okay. Did anyone in your presence from Probation ask [Appellant] where his bedroom was?
> **A:** No. Not to my knowledge.
> **Q:** That's okay. I'm just saying—
> **A:** I don't know. I was downstairs with him.
> **Q:** All right.
> **A:** He was not upstairs.
> **Q:** I understand that. But did anybody come downstairs—

> **A:** No.
> **Q:** --in your presence and ask [Appellant], where is your bedroom?
> **A:** No.
> **Q:** Okay. Did anybody ask Miss Morrow in your presence, when she was downstairs with you, where is your room?
> **A:** No.

*Id.* at 22-24.

Agent Cola noted she did not search any portion of the house; but rather, she supervised the five people who were at the house during the search. *Id.* at 26.

Agent Brian Shannon testified the purpose of the agents' visit was a random field contact to check on Appellant's father, who was a parolee, and he searched the upstairs in an effort to locate Appellant's father. *Id.* at 36. He testified he had no contact with any individuals upstairs, but another parole agent, Agent Michael Tomko, directed people, including Appellant, to go downstairs prior to the search. *Id.* at 41-42. Agent Shannon looked for Appellant's father in a room, which he described as a "blacked out room" resembling a common or party room with a television, futon, small refrigerator, and a table with drawers. *Id.* at 36-37. While "search[ing] around" in the room, Agent Shannon noticed drug paraphernalia lying on the top of the table, and in the table's top drawer, he found a handgun. *Id.* at 37, 41-42. He also discovered a firearm underneath the bed. *Id.* at 38.

On cross-examination, Agent Shannon denied observing Appellant in the room at issue and clarified he had no contact with any of the occupants while he was upstairs searching for Appellant's father. *Id.* at 40-41. He

further denied Appellant told him that the room he was searching was Appellant's bedroom. *Id.* at 42.

On redirect-examination, Agent Shannon clarified he could not recall whether Appellant immediately came downstairs when Ms. Morrow opened the door or whether he came downstairs after Agent Tomko found three other individuals upstairs. *Id.* at 49.

Pennsylvania State Trooper Troy Greenawald testified that, at approximately 12:40 p.m., he responded to the parole agents' request for assistance, and upon arrival at the house, after being briefed by Agent Cola, he spoke with Appellant, who was not under arrest but was seated on a sofa with Ms. Morrow. *Id.* at 53-54. Trooper Greenawald indicated he told Appellant he was free to leave and he intended to secure a search warrant for the residence based on the items that had been discovered by the parole agents. *Id.* at 54. During the conversation, Appellant admitted narcotics in the home belonged to him, as opposed to Ms. Morrow, and he consented to having his person searched, as a result of which Corporal Michael Taylor discovered $700.00 on Appellant's person.

Later that day, Trooper Greenawald secured a search warrant to search the entire residence, as well as a white pick-up truck parked in the adjacent driveway to the residence. *Id.* at 56. A subsequent search of the residence revealed ten re-sealable baggies of methamphetamine, marijuana, unused baggies, a digital scale, tally sheets, a cellular telephone, three firearms, and $1,523.00 in U.S. currency. *Id.* at 56-57. Trooper

Greenawald opined Appellant possessed the methamphetamine with the intent to deliver it.

On cross-examination, Trooper Greenawald admitted that, prior to securing the search warrant, he entered the house and went to the top of the stairs, where he observed leaning against and on a railing a glass vial of marijuana and firearms, which had been discovered by the parole agents. *Id.* at 63-64. Trooper Greenawald testified that, when he initially questioned Appellant, he indicated that an upstairs bedroom was used by him and Ms. Morrow. *Id.* at 68.

Ms. Morrow testified she and Appellant were asleep in the bedroom at issue when they heard knocking on the door. *Id.* at 75. Ms. Morrow indicated she answered the front door, while Appellant remained upstairs. *Id.* at 76. She further indicated that, upon entry into the house, Agent Cola instructed her to take the dogs outside and, when she returned from doing so, the agents were located throughout the house and Appellant was walking down the stairs. *Id.* at 76-77. Ms. Morrow testified she and Appellant sat in the kitchen and, when Trooper Greenawald arrived, he asked her which bedroom belonged to which occupants; however, he did not search the house at this time but remained downstairs. *Id.* at 78-79. Ms. Morrow indicated she and Appellant lived on one side of the house upstairs, while Appellant's father lived on the other side, and she and Appellant paid Appellant's father rent. *Id.* at 81.

Appellant testified Ms. Morrow answered the front door while he remained upstairs cleaning the bedroom and putting away any visible sign of contraband. *Id.* at 87-91. Appellant testified that, four or five minutes after Ms. Morrow answered the door, a male parole agent came upstairs and told him to "get the fuck out of here." *Id.* at 88. Appellant testified he told the male agent that it was his room but the agent instructed him to go to the kitchen. *Id.* at 89, 91.

Appellant indicated Agent Cola knew which bedroom belonged to him as she was in the house previously with regard to approving the residence for his father's use. *Id.* at 93-94. Appellant further indicated that, while he was in the kitchen, he asked to go outside to retrieve a cigarette from his truck, and the agents refused to let him leave. *Id.* at 92. Additionally, he indicated that, after Trooper Greenawald arrived, he questioned Appellant as to whether he possessed "a big bag of methamphetamine" and one of the officers instructed him to drop his pants and underwear in an effort to find the drugs. *Id.* at 94-98.

On cross-examination, Appellant admitted that he was told he was free to leave, he was never handcuffed, and he consented to the police officer's search of his person. *Id.* at 101.

At the conclusion of all testimony, by opinion and order entered on April 9, 2015, Judge Domalakes denied Appellant's pre-trial suppression motion. Appellant proceeded to a bench trial, at the conclusion of which he was convicted of the offenses indicated *supra*, and on September 18, 2015,

he was sentenced to an aggregate of twenty-three months of supervisory probation. This timely, counseled appeal followed. The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant timely complied asserting: "The Learned Suppression Court Judge erred in failing to suppress evidence seized as a result of an illegal search and seizure of [Appellant's] person and bedroom at [Appellant's] residence." Appellant's Pa.R.A.P. 1925(b) Statement, filed 10/14/15. The trial court filed a Pa.R.A.P. 1925(a) opinion indicating it was relying upon the suppression court judge's previously filed opinion.

Appellant contends the suppression court erred in denying his pre-trial motion to suppress the physical evidence seized by the parole agents, as well as by the state police officers.

Our standard of review for challenges to the denial of a suppression motion is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. . . .Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where. . .the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa.Super. 2012) (quotations omitted). *See Commonwealth v. Benton*, 655 A.2d 1030 (Pa.Super. 1995) (indicating it is within the suppression court's sole province to make credibility determinations). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073, 1087 (2013).

The "crux" of Appellant's argument is that, although the parole agents were permitted to conduct a warrantless search of the areas of the home occupied by Appellant's father in an effort to locate him, the parole agents were not permitted to search the bedroom at issue, which was exclusively occupied and rented by Appellant and Ms. Morrow, without their consent. Moreover, Appellant suggests the Commonwealth failed to meet its burden of proof and failed to rebut Appellant's and Ms. Morrow's testimony that Appellant was upstairs in the bedroom when a parole agent entered the bedroom and Appellant affirmatively told the parole agent the bedroom belonged to him. In this regard, Appellant points to the fact the Commonwealth failed to present the testimony of the male parole agent who allegedly ordered Appellant out of his bedroom.

Assuming, *arguendo*, Appellant's legal premise is correct, we note his argument is not supported by the factual findings of the suppression court. The suppression court indicated that, based upon its credibility

determinations, Appellant's father owned the single family home; neither Appellant nor Ms. Morrow informed the agents that one of the upstairs rooms was utilized exclusively by them; the room at issue was more akin to a common room or party room; Ms. Morrow's testimony she and Appellant rented the room from Appellant's father was incredible in light of the fact there was no evidence of rent receipts, no evidence of a lease agreement, and no evidence presented as to the amount of the alleged rent; the room searched was owned by Appellant's father, who was on parole; and Appellant, along with other individuals, stayed in the home only at times. Suppression Court Opinion, filed 4/9/15, at 2-7. We may not overrule the suppression court's credibility determinations in this regard and note the suppression court's factual findings are supported by the evidentiary record created at the suppression hearing. **See In re L.J.**, **supra**. Thus, we find no support for Appellant's factual assertion that he and Ms. Morrow exclusively occupied the room at issue.

Moreover, we find unavailing Appellant's suggestion that, since the Commonwealth did not introduce the testimony of the agent who allegedly "cleared the upstairs and ordered [Appellant] to leave his room," the Commonwealth did not meet its burden of proof or successfully rebut Appellant's and Ms. Morrow's testimony that Appellant was upstairs in the bedroom when a parole agent entered the bedroom and Appellant told the parole agent the bedroom belonged to him. The Commonwealth offered the testimony of Agent Cola, who indicated that, when Ms. Morrow opened the

door, Appellant was standing behind her, and the pair went into the kitchen together. N.T., 3/9/15, at 22-24. Agent Cola denied Appellant or Ms. Morrow indicated that one of the bedrooms belonged to them. *Id.* This testimony discounts Appellant's and Ms. Morrow's assertions that Appellant was upstairs when parole agents began searching the residence, that one of the agents ordered Appellant to leave, or that they informed the parole agents one of the bedrooms belonged to them. As indicated *supra*, the suppression court was permitted to resolve the conflicts in the testimony, and was free to believe all, part, or none of a witness's testimony. *See Benton*, *supra*.

Finally, after recounting the evidence in the light most favorable to him, Appellant presents an undeveloped argument suggesting he was improperly held in the kitchen for several hours and was not permitted to leave the residence until he was strip searched by the police. He, thus, suggests his person was illegally searched and evidence seized from his person by the state police officers should have been suppressed.

As in his previous issue, in applying the correct standard of review, we conclude Appellant's legal argument is based on an improper factual premise. After resolving the conflicts in the testimony, the suppression court concluded Appellant was not under arrest, was not handcuffed, and was free to leave the premises at any time if he chose to do so. Suppression Court Opinion, filed 4/9/15, at 3. The court noted that, upon the state police officers' arrival, Trooper Greenawald specifically told Appellant he was free

- 12 -

to leave and he was going to secure a search warrant for the premises. *Id.* The suppression court found Appellant then admitted the drugs in the home belonged to him and he consented to a search of his person. *Id.* at 4. The suppression court's factual findings are supported by the record and we decline to address Appellant's undeveloped argument further.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/9/2016